case. Case number 155723 and 155852 United States v. Richard Meade and Mark Justice. Oral argument is to be 10 minutes for the appellants and the appellee has 10 minutes, Mr. Curtis and Mr. Beck for the appellants. Counsel for the appellant you may approach the podium and proceed with your argument. I'm Mike Curtis on behalf of Mr. Meade and I would like to reserve two minutes for rebuttal if that's suitable to the court. Very well. You know I think as I said in my brief this is a record that is voluminous that's been ongoing, but when you look at it it boils down to a simple, simple issue. And that is under 18 U.S.C. section 1956 which is the money laundering statute that Mr. Meade and Mr. Justice were charged with deals specifically with specified unlawful activity. In other words, under 1957 you have criminally derived property which is the proceeds of the money laundering itself. Now when we're talking about specified unlawful activity, the Congress when it enacted the statute set forth in 1956 H7 what crimes were considered as specified unlawful activity. And what the government charged in the indictment is the specified unlawful activity is not enumerated in section 1956 H7. So if we don't have a crime then does the court have jurisdiction? Or can the government as it attempted in this particular case go to 1957 to use the term criminally derived property to escape what they knew the problems were and it wasn't inartfully drafted as the government stated. It was rather craftily drafted in order to achieve the objective to get an indictment and to get a conviction which the prejudice emanating from that conviction is that Mr. Meade and Mr. Justice who were reputable business people now stand convicted of a felony and unfortunately for them are now serving time in federal custody. So if the court is of the opinion that no crime has been stated because the specified unlawful activity is not enumerated as Congress has so dictated, then this is a very simple case that should require a dismissal. Now, when you look at it, we're not only talking about 1956-57, we're also talking about police reports that were admitted into evidence, we're talking about the failure to give a good faith instruction, we're talking about the number one co-conspirator, Jason Chapman, not being allowed to testify. We're also talking about the experts that the government used that we weren't able to see or be furnished with the discovery requests that we were made as it related to the expert testimony on how the government identified the stolen bikes. Then we had the jury prejudice involving a juror who we do not know as there was no hearing, but over two days this juror voiced concerns about somehow Mr. Justice's demeanor that this individual felt threatened. But there was no hearing to determine how that affected the other jurors and whether or not there was any spillover effect as it related to Justice over to me because we were both tried together, although we filed motions to have it severed. So when you look at the totality of the circumstances, a defendant is entitled to a fair trial. A defendant is a crime that Congress has so enacted. The executive branch has no authority to hybridize statutes by taking criminally derived property and putting it over in 1956 so it can get its conviction because proceeds is what is the key in this case. And without the proceeds, we do not have a case because the proceeds were the bikes that have always been the bikes, although now the government is contending that the proceeds were the bikes, not the bikes, but the titling in and of itself. And how did they get the titles? They got the titles from the police reports in which the government asserted, no, this is not for the truth of the matter asserted. Where was the good faith showing by the government to show that these witnesses were unavailable, which is a requirement under 801? There was absolutely nothing. And this court can tell the government, look, the government has all the resources that you can't short circuit it. You may not like to call these witnesses from Myrtle Beach, from Florida, wherever they may be, where these bikes were allegedly stolen more than since 2000. But yet they bootstrapped it because that was the easiest way to prove it. And we had no way to be able to ascertain whether or not these were the bikes that were stolen because these bikes were, as they say, chopped up basically. They were dismantled and new frames and et cetera were added. And there were MSOs, manufacturing statement of origins, and then titling. And then Meade and Justice relied on the Boyd County Sheriff's Department who inspected the bikes because neither one of these individuals were an expert in motorcycles and I couldn't tell you a stolen motorcycle from a real motorcycle or anything. But yet they relied on the Sheriff's Office inspecting these bikes. And then for the court not to recognize reasoning when knowledge is an essential element and the defendant is entitled to present his theory of the case, the good faith relies on the inspections by the Sheriff's Department and for that matter for the clerks for titling these bikes. So you take that issue and we submitted a good faith instruction and we did not get the opportunity to argue to the jury, although the government got what it wanted, a deliberate ignorance, which is basically an ostrich digging his head in the sand and the jury sees that and they say, well my God, he ignored it. He hid his head. They should have known. Well, we couldn't argue good faith because of the ostrich instruction. Now, was that a fun... Didn't you request those instructions that were given? At least you didn't object. Well, when we had the Tate and Hope was given, we relied on those. It was probably my fault and I'd have to say I was probably remiss for agreeing with those. And, you know, we all make mistakes and I probably should have objected more strongly, but I did. The reason being is I thought we were going to get a good faith instruction. Every case that I've had where the government sought to get a deliberate ignorance instruction, I've always had a good faith instruction. Because the case that I cited in my brief, if there's any evidence that would indicate, it's for a jury to decide. Why is it so harmful to let a jury look at an instruction for the defendant's theory of its case and let the jury decide whether or not meeting justice for acting in good faith instead of acting in deliberate ignorance? Okay. I know your red light is on, but I wanted to ask you one additional question here. Going back to the first point you were making about whether the indictment sufficiently alleged the specific elements of the offense. Now, on that issue, isn't this law in the Sixth Circuit against you? I know some other circuits have taken a different approach, but finding that in an indictment does not have to specify all the particulars of the elements of the predicate offense. Based upon our Sixth Circuit law anyway, you really wouldn't be able to prevail on that issue, this U.S. v. Cooney case and some of the other cases? Right. And, you know, I mean, it is what it is, and I have to agree with the court in its interpretation right there. But at the same time, there's always exceptions, and this case is more unique than the other cases because not only do we have a hybridizing of the indictment, we also have a specified unlawful activity that is not enumerated under 1956H7. So I think that's where we fall in under a crack or under a narrow exception to the general rule that the court is quoting. And what is the exception? That we have a charge under 1956. We have an element from 1957. 1957 punishes criminally derived property, i.e., the proceeds being the bites, whereas it was 1957. 1956 punishes really two separate distinct offenses. You have money laundering, and you have the specified unlawful activity. And I think that is the big distinction between 1956 and 1957. Of course, that's just my opinion, and your all's opinion trumps mine by a thousand times. Sorry about that. Please. I said sorry about that. I know that. Okay. Thank you very much. You'll have your rebuttal time. Thank you, Your Honor. Good morning. Good morning. I'm Jared Beck. I'm here on behalf of Mr. Justice. I'd also like to reserve two minutes for rebuttal. All right. First, I want to thank the court for granting oral argument in this case. I know that the court's time is valuable, and we appreciate the opportunity to be able to discuss a few of the issues we've raised in our briefs. With that in mind, I really want to focus on two of the issues that I think perhaps have application beyond this case. Number one, the disclosure of the confidential manufacturer identification information from Harley-Davidson and the methodology that the government's experts used. And number two, the juror bias issue that Mr. Curtis mentioned briefly. First, the manufacturer identification information. I think before we discuss what happened in the case, it's important to consider what it is that we're talking about. I think this got confused a bit in the lower court. As the government noted in its brief, Harley-Davidson maintains a system of paint stickers and confidential markings to assist law enforcement in tracking and identifying particular motorcycles and their components. It's important to note these identifiers are entirely obscure to a layperson. No person like Mr. Curtis or Mr. Meisler or myself or Your Honors would be able to look at a motorcycle and determine based on these markings, really wouldn't even be able to identify them, wouldn't even be able to figure out where they are, much less interpret what they mean. Do you think that's an accident? I don't believe it's an accident. It's purposeful, it's not. It's purposeful. I agree, and I think that the system that they've put in place was intended precisely for that reason, to assist law enforcement. It was created for that specific purpose, to allow law enforcement to track stolen vehicles, to prosecute defendants who are involved in it. And if the layperson could find it, then that would thwart the law enforcement efforts, would it not? Correct, correct. Yes. To that point, I understand the concern about the disclosure of this information. I think that the government's points are well taken. I believe in this case they went to extremes to make sure that they didn't disclose the information. Let me just ask you this. Was that your defense, that these were not stolen motorcycles? I think, well, I didn't represent Mr. Justice at trial. I believe the defense was kind of a combination of, we didn't steal them, and you can't even establish that they were stolen. Really? You think the defense was you can't establish that they're stolen with all the police reports and the descriptions and the whole? I didn't say it was a great defense, but I believe that was the defense that was. . . Because you did get to cross-examine the experts who knew where those obscure identifiers were. That's correct, but not about the identifiers themselves. Well, exactly, and if you had been trying to prove, or if the lawyer representing your client had been trying to prove that those were not stolen vehicles, it might be that that would have been a lot more cogent a point than it actually came off. I thought this was a knowingness, whether they knew these things were stolen, not whether they were stolen or not. Well, I think that those ideas are somewhat combined, because, I mean, you can't necessarily know that something is stolen unless it is. Well, it's the old receiving stolen property. Certainly you've run into that in state court if you've done a little criminal defense work, haven't you? I don't do a lot of state court work, but I'm familiar with that concept. But more to the point, the magistrate court, whenever the defense actually requested this information, was very thoughtful in considering whether or not it needed to be disclosed under the federal rules. The magistrate court determined that it should be disclosed. The concern about the dissemination of the information to other parties was addressed at that time. The government asserted that this is confidential information. We can't allow it out because then it will be of no use. But the magistrate court, I think, correctly determined that protective orders that we employ in our district, along with closed proceedings in court, would have been sufficient to protect the integrity of that information. And I think that's important because protective orders are used regularly in our district in cases where we have witnesses or informants whose lives are in danger. And I think that if a protective order is sufficient to protect those interests, the life of an individual, the proprietary information of a corporation can be protected in the same way. And, of course, in a way, the magistrate court's determination is what makes this case different. I know the government has cited cases from other circuits. I believe Short from the Seventh Circuit was somewhat on point. But the distinction in this case is that the magistrate court did determine that this information should be disclosed. That gets us over the initial threshold that the government notes, that we have to demonstrate a necessity for the information before it could be disclosed. And I think that's an important distinction here. Well, that might have been important at the magistrate judge's stage of this thing when the defense wasn't exactly clear or when the defense could have gone this way, that way, or right down the middle. But the question, I guess, was raised again in the district court at trial. Is that right? The question regarding? The release of the proprietary information. Correct. Prior to the Daubert hearing, after the magistrate court had issued his ruling, saying that we were entitled to this information, the defense requested a continuance because the government had not disclosed it. The Daubert hearing proceeded without the continuance. Then the district court actually upheld the magistrate court's ruling. I think that's important as well, confirming the magistrate court's rationale for allowing the disclosure of the information. Then the government, despite the fact that the magistrate court had already addressed this issue, said that they didn't have possession of these materials. The magistrate court determined, look, if your expert utilized these materials to reach their conclusions and they have already admitted in the Daubert hearing and their testimony that they have manuals that explain their methodology, then you do, government, have constructive possession of these materials. Therefore, you have to disclose them. In the end, what happened? The government acted as if they didn't have them, subpoenaed Harley-Davidson, allowing them to intervene in the case. Then the magistrate court determined, I think through some confusion about what we were requesting, that the information Harley-Davidson had in its database was the only information it was going to disclose. I think it's important to note that in doing so, the court actually recognized that we didn't have an expert at that time that would be able to analyze this information. I thought that was an important point because I think the federal rules envision the idea that a defendant would be permitted to employ its own expert to review information that's provided in discovery by the government. That would have happened, but we didn't have the information to be able to do so. But if you think about it, what questioning would you have employed having had that information? I mean, that goes to the heart of the conviction. I mean, really. It's difficult for me to... Well, of course it is, but come on. Well, my concern is I don't even know what the markings look like. I have no idea. It could be that it's possible... We don't want you to know. Right. It's possible that you could confuse a marking. It's possible that some of the motorcycles that were taken in this case... All the other evidence of the chop shop business goes away. You see the point that it would be harmless in light of the other evidence. Right. And back to Judge Daughtry's point, I think that in this case, our clients were not involved in the specified unlawful activity. They're not involved in the theft of the motorcycles. So it's very important to them, more so than the other... What your clients did, what are they convicted of? They are convicted of having laundered these motorcycles after they were stolen. Transferring the title. Correct, yes, to make it appear as if they're legitimate. But because our clients are so far downstream from the actual theft of the motorcycles, I believe this information was much more important to them.  There were witnesses who testified about other defendants who had stolen the motorcycles themselves. Your clients are on the hook for all of that, even though they weren't participants, right? We agree about that. Correct. They're saddled with all the evidence of the theft and the breaking down of the bikes and fooling around with the numbers, obscuring them, right? Therein lies my problem in this case, because our clients... This is the problem with the confidential markings. Our clients never would have been able to determine, based on just looking at a bike that someone took to them, that they were stolen. They proceeded in a way that... I mean, my client owned a junk, a genuine junk, a company that purchased parts from different vehicles and assembled motorcycles. I mean, it's difficult, without having access to this kind of information, to be able to establish that our clients truly did not know and had no reason to know that these parts or these motorcycles were stolen. I know you're out of time there, but I think your client also had the issue of the restitution order. Correct. Is there anything you need to offer on that, other than what's in your brief? Mr. Meisler, I thought he was as confused as I was, by the way, that this finished, because when I look at the indictment, I see a forfeiture order. When I read the transcript of the trial, I hear discussion about forfeiture, this money judgment. My concern with that procedure that the government recommended is that there is a possibility somewhere down the line, even though I agree the judgment does not reflect that forfeiture finding, that at some point there could be some type of correction to the judgment, because it was a part of the trial, and then my client will be forced to pay in a money judgment, monies that are really, under the Mandatory Victims Restitution Act, intended to be paid by other defendants to victims. So therein lies my concern with the process. I'm just concerned that in the end, my client's going to be required to pay more restitution than he's really obligated to pay. All right. Thank you. Give me a rebuttal time. Good morning, Your Honors. May it please the Court, Scott Meisler on behalf of the United States. I'll try to get to the money laundering and the confidential information issues, but I just wanted to respond very briefly while it's fresh in my head and the Court's head about what happened with the restitution order. If at some point in the future, and I'm not even sure that the rules would allow this, if at some point in the future the judgment were altered to include a forfeiture, I believe Rule 32.2 of the Federal Rules of Criminal Procedure actually has an appellate provision in there, which basically says if the judgment is modified to include forfeiture, you can then appeal from that. So if the Court has any concerns, and we don't think any are present in the record, there would be a future appellate opportunity, and the issue is not really ripe for the Court's consideration. If that's the only challenge to restitution, that's not really ripe and before the Court. Turning to the money laundering question, I want to be clear at the outset that the specified unlawful activity here was interstate transportation of stolen motorcycles. That's a violation of 18 U.S.C. 2312. And Mr. Curtis is correct that that statute is not listed directly in the money laundering statute. But what the money laundering statute does in its first definitional section is incorporate by reference the entire list of racketeering predicates in federal law. It's a separate statute. And in that list, 2312, Section 2312, interstate transportation of motor vehicles is included. So there's no doubt here, and the District Court addressed this matter in its post-trial ruling at Document 877. There's no doubt that the specified unlawful activity at issue here is one that is defined as such under federal law. And so the way the theory worked from there is that the specified unlawful activity of interstate transportation of stolen motorcycles produced proceeds, the motorcycles themselves. They were then titled to those motorcycles, was then transferred, and that is a money laundering financial transaction under federal law because the money laundering statute in its definitional provisions defines financial transaction to include transferring title to a motor vehicle. So that is the theory of the money laundering in a nutshell. So the efficiency of the indictment was not challenged until after conviction? It was not, Your Honor. And I think to this— So that gives us a different test, does it not? It does, and it gives you a much more deferential test. The District Court applied that test. And again, I do want to emphasize that no defect has been alleged, to my understanding, in the substantive money laundering counts that neighbor the conspiracy count. So what we're really talking about here is the use of an incorrect phrase that the government admitted below and the District Court found was basically just a scrivener-type error in the conspiracy count. There was no doubt and no lack of notice. And Judge Cook's, I think, point is well taken here, which is that no defendant objected before trial and said, we don't know what the charges are here. It was quite plain from the substantive counts what the basis for the charges were. So if we're thinking about the purposes of the indictment of putting a defendant on notice of how he's going to defend himself, the indictment here amply served that purpose, and the District Court, having presided over the trial, so found in its post-trial orders. Mr. Curtis also addressed the issue of the police reports. And the District Court issued a mid-trial order that said, Document 597 will rule in this objection as well, a written order explaining that the court was admitting those police reports not for the truth of the matter asserted, but basically to trace the government's investigative chain. And I think a really important point here is the government didn't just dump these police reports in. They were really a bike-by-bike explanation of how the experts got to the conclusion that each bike was stolen. And for 26, the government tried to trace 26 bikes that it tied to Mr. Justice and Mr. Meade, who were the Ashland, Kentucky-based title washers here. And for 20 of those 26 bikes, the government called in the victim of the theft. So we did undertake the expense of calling in these victims and subjecting them to cross-examination. I think that's important as well when we get to the issue of confidential information. So, again, I think there's no hearsay violation, no Confrontation Clause violation. And because the victims were called in many of those cases, even were there some kind of violation here, it would be a harmless error because the defendants had the chance to cross-examine the victims who made those reports of stolen vehicles to the police in the first instance. Mr. Curtis also raised the good-faith instruction and the deliberate ignorance instruction. And Judge Clay was right on point here. In the defendants' proposed instructions, they actually included a reference to Sixth Circuit Instruction 2.09, which is the deliberate ignorance instruction. So we think in the first instance, when the district court gives an instruction that you requested, that's a waiver, it's invited error. If not, it would be plain error, and there's no plain error when both this court and the plurality of the Supreme Court in Santos have said that deliberate ignorance instructions are appropriate in money-laundering cases when the defendant's knowledge is placed in issue. On the flip side, the good-faith instruction under this court's patterned instructions is not something that's given in every case. It's given in fraud cases where intent to defraud. It was Mr. Curtis did request it, did he not? He did request it. Okay. So why did the court reject that? The court thought long and hard about it and said, on the record at the charge conference, I reviewed the case law. I don't find any authority for giving a good-faith instruction. And in a money-laundering case where what's at issue is knowledge of the fraudulent and, sorry, knowledge of the stolen. The court essentially thought it would conflict and confuse. Either you have knowledge, in which event good-faith is irrelevant, is it not? I'm assuming that's the analysis. I think that was the court's rationale, Your Honor. And I think we've cited cases from out of circuit suggesting that good-faith instructions are not given or at least not routinely given in money-laundering  cases. The other point here, and I don't want to get off too much of a tangent, but the defendants, and Mr. Curtis did this again today, proposed two neighboring instructions. One was on good-faith. One was on what they call public authority defense. I think they kind of merged the two. And the district court certainly thought that a public authority defense where the defendant basically said, because the sheriff's office had passed on these titles, we relied on that. That's it. Almost like an advisive counsel defense. The court thought that was not appropriate and that defendants had not made out the legal prerequisites to that one. I do believe the court thought that it would be confusing to the jury to give a good-faith defense that essentially was trying to incorporate the theme of a public authority defense. The one point I want to make there, though, is that, again, this court has held, and so have other circuits, that when a court gives correct and thorough instructions on knowledge and allows a defendant to put on the kind of evidence he did, which would speak to his reliance on actions by the sheriff's office and by other actors in the chain here, it gives a correct instruction on knowledge and lets the defendant argue that to the jury. And, again, the instruction adequately covers what a defendant also would get under a good-faith instruction. So we think the same is true here. Turning then to the issues that Mr. — unless the court has further questions on those topics, I would turn to the issues that Mr. Beck raised on behalf of Mr. Justice. The confidential manufacturing information issue. I want to make one kind of global point here, which is that at the time some of these motions were filed, it is quite possible the defendants didn't know everything they wanted to know about the confidential manufacturer's information. But by filing those motions and by having a three-day Daubert hearing, a hearing on the motion to quash, they learned tremendous amounts about what was going on here. They learned the distinctions between the public vehicle identification number, called a public VIN, and a secondary number, or a confidential VIN. Those are kind of two categories, two separate categories. And a third category was that in some cases where all those numbers were obscured, the confidential ones, the public one, Harley-Davidson and the government resorted to a third set of numbers, paint-and-date codes that they were able then to input into Harley-Davidson's computer to narrow down possible public VIN numbers, cross-reference those with a list of stolen vehicles that law enforcement gets on a national database. And then, again, didn't just stop there. Tracked down the bike, tracked down the motorcycle, and had a victim, the victim of the theft, identify the bike. Twenty of those victims came to court. So if you were taking the motorcycle apart and you saw some sort of paint number and date number, you have no idea that that was going to be able to be used to identify the vehicle. Is that the idea? I mean, you could even find that and not realize it had any relevance. Right. And I think that's correct. And the magistrate judge addressed this thoroughly at the hearing on basically trying to understand how Pete Simmitt from Harley-Davidson used the information. They had to put it into Harley's computer. Harley's computer itself has proprietary information of the company and of suppliers. And so the magistrate judge heard all this. And that's why I also want to emphasize that this issue was thoroughly aired. The same magistrate who initially ordered disclosure held a separate hearing on this and in Document 461 basically said, look, I granted you supplemental discovery on a very narrow category of information because the government had given you much of this. You learned more of it at Daubert. I'm giving you additional supplemental discovery into a very narrow class of information called tools used to identify these motorcycles. The magistrate heard additional evidence on that, including evidence about these law enforcement manuals, which are not part of the record. They're confidential law enforcement manuals. Ultimately, though, was there some kind of strenuous defense that these were not stolen vehicles? There was not. I think Your Honor hit exactly the point. And Mr. Justice's opening brief makes the same point. The primary defense was lack of knowledge, the point Your Honor made. We didn't know. We were not the bike thieves. We didn't know. And the jury heard a lot of information about that. That was the main pitch from the defense. They perhaps credited that defense as to Mr. Ferguson, who was acquitted, but they did not as to Mr. Justice and Mr. Mead. And there's no sufficiency of the evidence challenged before this court on appeal. So, again, we think that the – I would say the court has any doubts on any of these matters. The district court issued an extraordinary number of thorough mid-trial and post-trial orders in this case. And so if the court has any doubt or wants details on those matters, the district court's orders are the best place to look. I think the last issue mentioned was the Remmer hearing, the lack of a hearing when there were a couple incidents regarding the jurors during trial. Those are questions that are kind of at the apex of the district court's discretion. They're reviewed for abuse of discretion. The court, again, issued a thorough mid-trial order. And I think two findings are relevant here. One is that the question about Mr. Justice staring at the jurors and making them uncomfortable was the subject of a published decision from this court called Owens. The district court had that decision at hand and basically read Owens for the proposition that in-court staring is not an extraneous influence on the jury that triggers the obligation to hold a hearing. And the second incident was with a district court called de minimis unintentional contact, which happened in the parking lot outside the courthouse. There was no verbal or nonverbal communication. The jurors didn't say they felt intimidated or scared. They said they felt uncomfortable. The court found that normal for jurors to run into defendants feeling uncomfortable, especially in a parking lot at night and when they've been instructed to have no contact with the parties. And then the court said it would address that matter by having the jurors leave ahead of the defendants. After that decision by the court, no further incidents were reported. So again, we think there's no abuse of discretion and that if the court has any doubts about the specifics of those matters, it could look to document 597, which is the court's mid-trial order denying the motion for a mistrial. I'm happy to answer any further questions. If not, I'd yield my time to the court. All right. Albert Bunnell? Just briefly. In regards to Judge Daugherty's question to Mr. Beck as it relates to stolen property, under Kentucky law, if one is in possession of stolen property, then there's a presumption that he knew or should have known that the property was stolen, which is one of the few cases in which you have a rebuttable presumption. You can do it rebuttal by the defendant. In this particular case, the lack of knowledge that the bikes were stolen was the whole key to the defense. It wasn't whether or not the bikes were stolen. We didn't know the bikes were stolen. Right. That was my point. Right. We didn't know the bikes were stolen. So the whole key to the case was the lack of knowledge and the reliance on the titling process that the Commonwealth of Kentucky had in place for rebuilt or custom bikes. And that is what the whole defense was. And that's why we thought it was extremely important as to our theory, being the lack of knowledge, that the good faith instruction should have been given because at least there was some evidence, as I quoted in Duncan v. United States, that we believed that we were entitled to it. This isn't a case where the defense did not testify, is it? My client did not testify. Didn't, okay. My client did not testify. We had a former sheriff, Sturgill, who was a Boyd County sheriff, who testified that he inspected a lot of the bikes and that he did not know any of the bikes were stolen. And some of the documents also indicated that the present sheriff at that time, also personally inspected the bikes. Time's up. All right. Thank you. Thank you. Very briefly, I just want to address the juror bias issue. Mr. Meisler correctly noted there is a published decision in this circuit regarding staring.  Not trying to, but creating a precedent where a defendant would be incentivized to try to create a mistrial by intimidating a juror, staring at them in the jury box. But the scenario that actually occurred in this case I think is easily distinguishable from that. Immediately when this juror actually reported the first incident, all of the parties agreed that Mr. Justice hadn't done anything intentional. There was no evidence whatsoever of that. And actually, even after the second report, there was no indication whatsoever that Mr. Justice had tried to engage any of the jurors or anything. That's the difference. There's no intentional conduct there. And also, we have two incidents, not just one, two incidents, one in court, one out of court. We also have evidence apparently that other jurors were made aware of it and actually had their own concerns on the second occasion. I think in that kind of a situation, due process really just requires that the court inquire of the juror, that particular juror, and any other jurors potentially that have expressed these types of concerns to ensure that they're still impartial and that the verdict that they reach we can trust. That's the distinction I see. I don't believe this case is like the cases that have been cited thus far. I think this is a distinct situation where the defendant didn't do anything intentional. And I think the judge really needed to conduct a hearing, especially when you consider that earlier during the proceedings, he'd indicated he'd allowed the parties to make the decision about how to handle it. Of course, he still retains the discretion to decide what he wants to do. But eventually, the government actually agreed that, yes, we probably do need to discuss this with the juror to make sure everything's okay. But at that point, the judge didn't follow up, didn't conduct the hearing. And so for those reasons, I really do believe we really can't trust this verdict. Thank you. Thank you. Case is submitted.